In the matter of the petition for probate of a paper-writing purporting to be the last will and testament of BARBARA PEPPLER, deceased.

[Decided October 14th, 1942.]

*Mr. Joseph Steiner (Mr. Israel B. Greene,* of counsel), for the caveatrix-appellant.

*Messrs. Vanderbach & Vanderbach (Mr. John J. Fallon,* of counsel), for the proponents-respondents.

EGAN, VICE-ORDINARY.

This is an appeal by Emeline Roffe, caveatrix, the daughter and one of the heirs-at-law of Barbara Peppler, deceased, from a decree of the Hudson County Orphans Court dated December 8th, 1941, admitting to probate the alleged will of Barbara Peppler dated February 23d, 1934. It is the second appeal from proceedings in the Hudson County Orphans Court affecting the said estate. An opinion dated April 6th, 1939, was filed in the last appeal to this court and from the decree thereon dated June 7th, 1939, an appeal was taken to the Court of Errors and Appeals. See *In re Roffe, 127 N. J. Eq. 110; 10 Atl. Rep. (2d) 739.*

The testatrix died August 16th, 1934. Her daughter Emeline contested the probate of her will in Hudson County, contending that it was improperly executed, that the testatrix was not of sound mind, and that her brothers, sons of the decedent, John G. and Henry W. Peppler, had unduly influenced the testatrix in making the will. On October 19th,

1934, the Orphans Court referred the dispute to Herman Lipschitz, a master in Chancery. He reported to the Orphans Court that the testatrix had mental capacity, that the will was properly executed, and that although there were "a number of suspicious circumstances surrounding the making of the will," it was not the product of undue influence. The Orphans Court on August 7th, 1935, admitted the will to probate.

Thirteen days after the will was prepared, John G. Peppler, aforesaid, obtained from the testatrix assignments of three mortgages aggregating the sum of $14,400. His title to them was disputed by Emeline in a counter-claim filed by her in proceedings instituted in this court on February 22d, 1934, by the decedent Barbara, John G. and Henry W. Peppler against Emeline and her husband, John C. Roffe. John G. and Henry W. Peppler testified therein that John G. had purchased the mortgages from the testatrix some years before her death and had deposited the purchase price thereof to her account. The evidence disclosed that John G. and Henry W. had very close relations with their mother; that she confided in them; trusted them and relied upon their advice in practically all matters involving her interests; and that they had managed and controlled her extensive business affairs. The decision of this court in that suit was taken to the Court of Errors and Appeals and its conclusions are reported in *Peppler* v. *Roffe, 122 N. J. Eq. 510; 194 Atl. Rep. 548.*

Mrs. Roffe in her counter-claim to set aside the assignments of the mortgages to John G. alleged that they were the product of fraud, undue influence, and without consideration. This court sustained John's title to the mortgage assignments and dismissed the counter-claim. The Court of Errors and Appeals modified the decree holding that there was no consideration for the assignments of the mortgages, and that John G. had procured them through undue influence. In the course of that suit in this court, John G. made an affidavit on May 12th, 1936, which in part reads as follows:

"I have not, nor has Barbara Peppler, during her lifetime, transferred or assigned any of said holdings to any person, but both myself and Barbara Peppler have signed incomplete powers of attorney, and otherwise placed securities in a transferrable condition * * *."

When the *remittitur* of the Court of Errors and Appeals was handed down, the caveatrix then applied, by petition, to the Orphans Court to reopen the decree of probate. She there contended that the Court of Errors and Appeals' decision had established that the probate of the will had been procured by the perjured testimony of her brothers, and that the will was the product of their undue influence. Her application was denied. Thereupon, she again appealed to this court. Her appeal was heard and the aforesaid opinion of April 6th, 1939, was rendered holding, in effect, that John G. and Henry W. Peppler gave false testimony in the will contest and thereby procured the decree of probate. The Orphans Court was reversed and it was directed to grant the caveatrix an order based on her petition, "whereby petitioner [Mrs. Roffe] be afforded adequate opportunity to be heard and present proofs to substantiate said petition on the merits." From that form of *remittitur,* caveatrix again appealed to the Court of Errors and Appeals. The respondents also filed a cross-appeal. On January 25th, 1940, the Court of Errors and Appeals reversed this court's form of *remittitur,* dismissed the respondent's cross-appeal as without merit, vacated the decree of probate entered by the Orphans Court, and remanded the cause for a new hearing on the merits. See *In re Roffe, 127 N. J. Eq. 110; 10 Atl. Rep. (2d) 739.* On May 23d, 1940, a rehearing was had before the Orphans Court on the original record and upon supplemental testimony submitted by the parties. On September 16th, 1941, the judge of the Orphans Court wrote a letter to counsel stating that he had considered the matter and reached the conclusion that the will should be sustained. He filed no opinion. He signed a decree admitting the will to probate for a second time and from that decree the caveatrix appealed; and that appeal is now before this court. I believe the Orphans Court erred.

In the final hearing in the Orphans Court, and in this proceeding, counsel agreed that the record of the previous hearing which was had before the master, be admitted as evidence, as well as the proceedings that were had in the Orphans Court together with the exhibits that were offered at the hearings.

When the testatrix executed the will, she was seventy-nine years of age, and was suffering from a malignant cancerous ailment which caused her death, six months later, on August 16th, 1934. Her son John G. was then of the age of fifty-three years. He had been a student of law, but had never been admitted to practice; he had been vice-president of a large and reputable banking institution in Hudson County. He had considerable business experience. He was the advisor and counsellor in nearly all the family affairs. The testatrix relied on his judgment and advice. He had her implicit trust and confidence. He drew the will under consideration as well as several earlier ones for his mother. In the course of the family business, he prepared deeds of conveyance and contracts; prepared and recorded assignments of mortgages; and drew other documents requiring technical skill. He organized corporations for the transaction of the family business and the holding of family property. He conducted and managed the meetings of those corporations. He held joint title with his mother to the capital stock of the corporations; and he held joint title to bank accounts with her. The testatrix kept her securities and papers of importance and valuables in a wall safe to which access was had by John G. and Henry W. The testatrix would not sign or execute any written instruments unless John G. or Henry W. were present. John G. secured the witnesses to her last will. He and his brother Henry W. engaged a taxi to convey the testatrix to a real estate office where she executed her will in the presence of those witnesses. They accompanied her to that office—although they did not remain in the room during the signing of the will.

In its aforesaid opinion, dated April 6th, 1939, this court said among other things:

. "It appears that John G. Peppler occupied a fiduciary position. It was a relationship of trust and confidence between him and his mother. He prepared her will and procured the attesting witnesses thereto. He substantially profited under the terms of her will. The fiduciary relationship placed upon him the burden of establishing by clear and convincing proof that he did not abuse the trust and confidence reposed in him. *In re Colton Estate, 11 N. J. Mis. R. 410; 166 Atl. Rep. 52.* The advisory master relieved him of that obligation. In doing so, he erred. He placed that burden upon the appellant, Emeline Roffe. It should have been assumed by John. *In re Smalley, 124 N. J. Eq. 461; Peppler* v. *Roffe, supra* * * *.

"The judge of the Orphans Court confirmed the report of the advisory master when he signed the decree admitting the will to probate. In doing so, he approved the master's error and thus ignored substantial property rights of the petitioner."

That quoted observation of this court fits in most appropriately with these conclusions.

The family relations of these parties were apparently amicable until on or about February 16th, 1934, when a quarrel arose between John G. and the caveatrix and her husband, which culminated in a police court proceeding wherein John G. charged his brother-in-law with assault and battery. On February 20th, 1934, Mrs. Roffe removed certain papers and securities from the family safe. She claimed she did this with the testatrix' consent (page 538). Her action in doing so resulted in the first suit aforesaid in this court. *Peppler* v. *Roffe, supra.* Barbara Peppler died before the suit was heard. It was prosecuted by John G. and Henry W. individually and as executors of Barbara Peppler's estate.

John G. drew two previous wills for his mother, one in 1920 and one in 1922, after family conferences which were attended by Mrs. Roffe (pages 1025, 1110), in which testaments Mrs. Roffe was made the sole beneficiary. After the quarrel of February 16th, 1934, John G. and Henry W., it is alleged, frequented their mother's room but would not

permit Mrs. Roffe to enter it; they threatened to kill her if she did. She had assisted in nursing her mother and in ministering to her wants. When the testatrix left her home, accompanied by her sons, John G. and Henry W., to execute the will at the real estate office as aforesaid, Mrs. Roffe was absent from the family home; she was not apprised beforehand of the move to execute the will, and did not learn about its existence until after her mother's death (pages 1027, 1032, 1112). After the will was executed, Henry W. took possession of it and gave it to John G. (pages 1116, 1117).

In refutation of the caveatrix' contention of the imposition of undue influence upon their mother, John G. and Henry W. point to the testatrix' equal distribution of her property among her children as a complete answer, declaring it to be an even maternal disposition among the natural objects of her bounty without favoring one child as against the other. Mr. Justice Porter speaking for the Court of Errors and Appeals in *In re Roffe (127 N. J. Eq. 110; 10 Atl. Rep. (2d) 739), supra,* said:

"Reversal by respondents is urged on the ground that as appellant received one-third of the estate under the will there could be no undue influence; * * *

"We conclude the cross-appeal is without merit for the reason that undue influence can be exerted even though the person complaining was provided for in the will."

With Mr. Justice Porter's reasoning I thoroughly concur. The proponents say that the will was made by the testatrix through resentment after she had discovered that the caveatrix had removed the securities from the family safe. *Peppler* v. *Roffe, supra.* The caveatrix meets this charge by calling attention to the testimony of John G. wherein he stated that he drafted the will on the night of February 19th, 1934 (pages 1074, 1076), which was the day before the securities were removed from the family safe. It follows, therefore, that the proponents' statements are unfounded and false.

The Court of Errors and Appeals in considering John's explanation of the so-called assignment to him of the three mortgages, said:

"The learned vice-chancellor points out that the mortgage assignments were made after the discovery of the abstraction of the securities from the family safe by Emeline, and shortly after the institution of this suit for their recovery; and this he considered sufficient to sustain the inference that consequent resentment motivated the transfer. But such an inference is negatived also by the provisions of the mother's will, executed the day after the institution of this suit to recover the securities so taken by Emeline, bequeathing and devising to her and her two brothers the entire estate in equal shares, without any allotment to Henry of securities or other property in an equal amount. Rather, it suggests that John sought to offset the advantage which he conceived Emeline had thus secured." *Peppler* v. *Roffe, supra.*

I believe there is merit in the contention of counsel for the caveatrix, wherein he argues that John's explanation is discredited by the following undisputed facts in this case:

"1. Because it stands adjudicated that he gave false testimony in the first probate proceedings, relating to the circumstances under which he obtained the assignments of the three mortgages.

"2. Because it stands adjudicated that he imposed upon the Orphans Court, by false testimony, in originally procuring the probate of the will in question.

"3. Because it stands adjudicated that he procured the assignments of the aforesaid three mortgages by fraud and undue influence exercised upon his mother within thirteen days after the contested will was executed."

*Sinclair* v. *Sinclair, 57 N. J. Eq. 222; 40 Atl. Rep. 679; Weigel* v. *Weigel, 60 N. J. Eq. 322; 47 Atl. Rep. 183; Atha* v. *Atha, 94 N. J. Eq. 692; 121 Atl. Rep. 301; affirmed, 95 N. J. Eq. 275; 122 Atl. Rep. 926.* In *Claffey* v. *Ledwith, 56 N. J. Eq. 333; 38 Atl. Rep. 433,* the court said:

"Nor is the burden borne by the showing that, at some time during the months covered in the process of will-making, the old father echoed the argument of his daughters, that the respondent's family were extravagant, and would squander his money. It may be that, in his enfeebled state, this argu-

ment had been so constantly kept before him as to take possession of him and become irresistable and drive out all other considerations. * * * The atmosphere in which he acted was apparently filled with influences against an adequate recognition of his grandchildren. His meagre proposed award of $100 to them indicates that its influence upon him was strong—beyond the wishes of even his daughters. It was their influence which caused him to raise the sum to $1,000.

"I think that under the proofs, left in this condition without explanation from Mrs. Claffey, the Orphans Court properly decided against the will on the ground of undue influence."

If the favorable feeling of the testatrix toward the caveatrix lessened and changed, as testified to by the proponents, it is my opinion, that it was occasioned through the instance of John G. and Henry W. by their statements and accusations to the testatrix concerning Emeline which were false and without foundation. It was done by them with the intention of alienating the testatrix' affections and causing her to change her will. Mrs. Schmidt, the housekeeper, testified that after the quarrel on February 16th, 1934, John G. told his mother that the caveatrix was losing her mind (page 57). The caveatrix said that after the fight her brothers told the testatrix: "Mother you know that Emeline is crazy, she is going to sign everything over to her husband, we have to get it back" (pages 230, 231, 237). Emeline entered her mother's room and found her signing a paper in the presence of Henry W. whereupon she questioned her mother as to her action, and Henry W. then flew into a rage. Subsequently the testatrix told the caveatrix that she had to sign the paper "because I [the caveatrix] am crazy and wanted to give it to my husband" (page 238).

Emeline testified that John G. and Henry W. threatened the testatrix that if she didn't sign certain papers they would have the caveatrix arrested (page 240); that they threatened to take her (testatrix) to a hospital if she didn't sign certain

papers (page 257); that John G. and Henry W. were annoying her to sign papers, that she was afraid of them (page 288); and that testatrix was "afraid that they will do away with me" (page 293).

John G. admitted telling his mother, "Mother, you know what has happened, you know how far she has acted, you know what she has done. If it is your desire to change the will all right, but I don't see you dying in a hurry" (page 1073). John further testified that Henry joined in, saying: "He agrees that that is the proper thing to do because we couldn't trust Emeline any longer" (page 1074).

I believe that the trust and confidence which the testatrix reposed in the proponents was grossly abused. They have not shown by clear and convincing testimony that the testatrix was a free agent in disposing of her worldly assets by her alleged will. "Undue influence is a species of fraud. It must be such as destroys free agency; such as overpowers one's volition and constrains one to do that which one would not otherwise have done." *Campana* v. *Angelini, 132 N. J. Eq. 285.* The proponents' denial of exercising undue influence is wanting in credibility. They have failed to meet the burden their position of trust imposed.

In *In re Morrisey's Will, 91 N. J. Eq. 480; 111 Atl. Rep. 26,* Vice-Ordinary Backes said:

"Mrs. Flemming denied the legal imputation, but her testimony does not measure up to the required standard, and for this reason: * * * Mrs. Flemming professed to be ignorant of what became of the money. She was the old lady's caretaker and knew her every move. Her story that Mrs. Morrisey carried these bundles of bills on her person—the $3,000 when she was admittedly *non compos*—and her intimations that she frittered them away, are improbable and incredible. I believe she knew more than she was willing to tell on the witness stand, and that she either had the money or knew what became of it. Her disingenuous disavowal of knowledge concerning its disappearance impeached her testimony as a whole and renders her denial of unlawful complicity in the making of the will untrustworthy and undepend-

able. The burden cast upon the proponents of neutralizing the presumption of undue influence by believable evidence has not been met, and probate must therefore be denied."

All the facts and circumstances in the instant case justify and require the reversal of the decree of the Orphans Court in admitting the said alleged will to probate.