**Sophie NOTT, Plaintiff,**

v.

**Marion B. FOLSOM, Secretary of Health, Education and Welfare, United States of America, Defendant.**

United States District Court
S. D. New York.
May 9, 1958.

Arnold H. Fassler, New York City, for plaintiff.

Paul W. Williams, U. S. Atty., for the S. D. of New York, New York City, John A. Guzzetta, Asst. U. S. Atty.,

Fresh Meadows, N. Y., M. J. McQueen, Associate Gen. Counsel, Washington, D. C., of counsel, for defendant.

WEINFELD, District Judge.

These are cross-motions for summary judgment in an action instituted by the plaintiff to recover widow's benefits under the provisions of the Social Security Act.[1] The parties agree there is no genuine issue of material fact and that the matter is ripe for disposition under the summary judgment rule.

The issue presented is one of novel impression in this District—whether a widow admittedly entitled to benefits under the Act, who enters into a remarriage which is annulled for fraud, is reinstated to her prior status as a widow so as to entitle her to benefit payments as such widow.

The facts are: the plaintiff was the wife of Max Nott, a wage earner covered under the terms of the Act, who died in September 1949. They had been married in New York State where they continued to reside until Nott's death.

In January, 1955 the plaintiff married one Louis Klein. In July, 1955 Klein instituted an action in the Supreme Court of the State of New York to annul the marriage on the ground of fraud charging the plaintiff with refusal to consummate the marriage. An interlocutory judgment was entered, which by its terms was to, and did, become the final judgment as of course three months after its entry, and which also provided that thereupon "the said marriage shall be annulled".

In October 1956 the plaintiff alleging she was the widow of Nott, applied for widow's insurance benefits under the Act. Her application was denied by a Referee after a hearing and his decision was affirmed on appeal by the Appeals Council of the Social Security Administration. It is this ruling which is sought to be reviewed by the present action.[2]

1. 42 U.S.C.A. § 301 et seq.

2. 42 U.S.C.A. § 405(g) provides for judicial review of a "final decision of the Secretary".

Section 202(e) (1) of the Act,[3] in pertinent part provides:

"The widow * * * of an individual who died a fully insured individual after 1939, if such widow—

"(A) has not remarried * * * shall be entitled to a widow's insurance benefit * * *".

The basic question, of course, is the status of the plaintiff—was she remarried within the meaning of the term as used in the foregoing section so as to preclude her from the benefits. The plaintiff contends that since her rights derive from a federal statute the meaning of the word "remarried" must be determined as a federal question without reference to state law or state court decisions and further the statute must be liberally construed to carry out its objectives.[4] Accordingly, she urges that "remarriage" as used in the section be defined to mean a valid remarriage—that an annulled marriage be not deemed a remarriage. It is argued that only such a definition will afford plaintiff and others similarly situated the economic benefits intended for them and will result in even and uniform applicability of the intended benefits.[5]

We agree that the interpretation of the Act is a matter of federal law and that the Act is to be construed so as not to defeat its intended objectives,[6] but this does not mean the courts are empowered to define the language of the Act so as to legislate where Congress has failed to do so. The act itself contains no definition of the word "remarriage" appearing in Section 202(e) (1). Accordingly, I am of the view that its meaning and the status of the plaintiff under the Act is governed by reference to state law—in this instance—the law of the State of New York. This was precisely what was done by the Supreme Court in determining the meaning of the word "children" appearing in the Copyright Act.[7] There the Court stated: "The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law. * * * This is especially true where a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter of state concern".[8] Moreover, it is significant that in other instances the Act specifically refers to state law for the determination of the status of the parties who may be entitled to receive benefits thereunder.[9] This strongly suggests a general Congressional policy that the legal status arising out of familial relationships be determined by reference to the law of the state which created those relationships.

Accordingly, we look to the law of the State of New York to determine the effect of its annulment decree upon the status of the plaintiff. She contends that

---

3. 42 U.S.C.A. § 402(e) (1).

4. It is not without interest that in Folsom v. Pearsall, 9 Cir., 245 F.2d 562, it was the Social Security Agency which urged that the Act be interpreted without reference to state law contending that turning to state law for the meaning of the word "remarriage" would lead to varying results among the states. In the instant case, it has reversed its position. Here it is the plaintiff who contends the meaning of the word should be decided solely within the context of the Federal Act to avoid disparate results, whereas the Agency urges reference to state law.

5. Cf. Sparks v. United States, D.C.D.Vt., 153 F.Supp. 909.

6. Schroeder v. Hobby, 10 Cir., 222 F.2d 713; Ewing v. Risher, 10 Cir., 176 F.2d 641.

7. 17 U.S.C. § 24.

8. De Sylva v. Ballentine, 351 U.S. 570, 580, 76 S.Ct. 974, 980, 100 L.Ed. 1415. See also Gibran v. Alfred A. Knopf, Inc., D.C.S.D.N.Y., 153 F.Supp. 854, affirmed Gibran v. National Committee of Gibran, 2 Cir., 255 F.2d 121.

9. 42 U.S.C.A. § 416(h) (1) under which state law governs the determination of who is a "wife, husband, widow, widower, child, or parent"

even under New York law the annulment for the purposes of this proceeding rendered her marriage to Klein void ab initio —as if she had never remarried. Plaintiff relies heavily upon the doctrine of "relation back" whereby a marriage is deemed extinguished from its inception, enunciated by Chief Judge Cardozo in Sleicher v. Sleicher, 251 N.Y. 366, 167 N.E. 501. There, the defendant, the first husband of the plaintiff had agreed to pay her alimony so long as she remained unmarried. The agreement was later incorporated in a divorce decree entered in favor of the wife. Upon her remarriage the defendant ceased paying alimony. The second marriage was annulled for fraud and the wife sued her first husband seeking alimony (1) retroactively, for the period she had been married to her second husband and (2) prospectively, for the period commencing from the date of the annulment. Her claims were bottomed on the contention that the annulment voided her second marriage from its inception and reinstated her right to the payments from the first husband as if she had never remarried. The New York Court of Appeals allowed recovery only for prospective payments and denied it as to those which had accrued while the second marriage was in effect. It is true that Chief Judge Cardozo, speaking for the Court of Appeals, said: "A marriage procured by fraud is voidable, not void. Even so, annulment when decreed, puts an end to it from the beginning (citing cases). It is not dissolved as upon divorce. It is effaced as if it had never been" (251 N.Y. at page 369, 167 N.E. at page 502). However, this statement must be viewed against the background of the then existing law of New York State, under which alimony could not be granted to a wife where the marriage was annulled.[10] In this circumstance, unless relief were available, the wife would be without support either from the first or the second husband. Thus, to avoid this result the doctrine of "rela-

tion back" was applied as a matter of public policy and a matter of justice. As quoted by Chief Judge Cardozo, "The doctrine of relation is a fiction of law adopted by the courts solely for the purposes of justice". However, it could not be used as a two-edged sword to injure an innocent stranger such as the first husband who in reliance upon the validity of the second marriage had ceased making payments to his former wife while it still subsisted. The doctrine of relation back was thus held to be "not * * without limits, prescribed by policy and justice: * * * [which] have their typical application to the rights and duties of a stranger. * * * To say that the judgment of annulment has put the defendant in default through the fiction of relation is to say that the plaintiff shall have support or an equivalent from each of two men during the same period of time, and this by force of a fiction subservient to justice". (251 N.Y. at pages 369–370, 167 N.E. at page 502)

Accordingly, the doctrine was given limited scope which enabled plaintiff to enforce compliance by the first husband of his obligation to support her but only from the date the decree annulling the second marriage was entered. This indicates, at least sub silento, that the second marriage until its annulment was valid.

The doctrine of "relation back" continued in effect until the New York State Legislature enacted Section 1140–a of the Civil Practice Act which authorized its courts in an action to annul a marriage, to give directions for support of a wife by the husband as justice requires. Thus the situation which moved the court in the Sleicher case as a matter of public policy and justice to resort to the fiction of "relation back" was eliminated.

In 1954 the New York State Court of Appeals had occasion in Gaines v. Jacobsen, 308 N.Y. 218, 124 N.E.2d 290, 294,

---

10. See Jones v. Brinsmade, 183 N.Y. 258, 76 N.E. 22, 3 L.R.A.,N.S., 192.

48 A.L.R.2d 312 to reconsider the doctrine and the impact of the statute upon it. Judge Fuld speaking for the Court stated:

"Today, through the operation of section 1140–a, the wife can receive support from the husband of the annulled marriage, where 'justice requires,' and there is no more reason to revive the obligation of the first husband—a stranger to the annulment—than there would be if the remarriage were terminated by divorce. * * *

"Not only does the practical justification for the Sleicher decision fall with the enactment of section 1140–a, but its doctrinal basis becomes extremely questionable as well. The fiction that annulment effaces a marriage 'as if it had never been' is sometimes given effect and sometimes ignored, as the 'purposes of justice' are deemed to require. * * *

"By writing section 1140–a into the law, the legislature has chosen, without regard to whether the marriage is void or voidable, to attach to annulled marriages sufficient validity and significance to support an award of alimony, in other words, to serve, the same as any valid marriage would, as the foundation of a continuing duty to support the wife after the marriage is terminated. See Johnson v. Johnson, 295 N.Y. 477, 68 N.E.2d 499. It has declared, in effect, that, for the purpose of sustaining a right to support after annulment, the annulled marriage is no longer to be deemed a nullity. 'effaced as if it had never been.' In so doing, the legislature has destroyed the very foundation of the Sleicher decision. * * * *"

■ Thus, the conclusion is compelled that under New York law a voidable marriage annulled on the ground of fraud is not void ab initio and the rule of the Sleicher case with its "as if it had never been" is no longer the law. Clearly the remarriage is binding and effective not only until annulled, but it continues to have sufficient validity on which to bottom a decree for support of the wife.

■ The Social Security Act was intended to give some economic support to a widow who has been deprived of it by reason of her husband's death. Remarriage, of course, meant, at least theoretically that such economic assistance was no longer required. Under New York law, unlike the laws of most other states, there is now available to a wife who is a party to an annulled marriage the means of compelling support. The circumstance that the plaintiff in the instant case did not apply for such relief does not detract from the existence of the power of the courts to make appropriate directions for her maintenance. Indeed, the statute even though no provision was made in the judgment for the support of the wife, does not preclude the Court from amending the judgment to contain a direction to the husband to make support payments.

The fact that reference to state law for the meaning of "remarriage" may result in varying application of the federal statute is a matter for Congressional consideration.[11] To uphold the plaintiff's contention that state law must not be considered and that the words "has not remarried" be given uniform definition under the Act in all states, requires the Court to legislate where Congress failed to do so; in fact it would require the Court to add in substance to Section 202 (e) (1) the following: "except that in the event of remarriage she shall again be entitled to such benefits if the marriage has been annulled under the laws of any state".

11. It was this situation which led Mr. Justice Douglas in De Sylva v. Ballentine, 351 U.S. 570, 583, 76 S.Ct. 974, 100 L. Ed. 1415 to except to the Court's holding that the meaning of the word "children" used in the Federal Copyright Act was to be determined by state law, although he concurred in result.

'While we by no means regard it as conclusive some idea of Congressional attitude may be gleaned by an amendment to Section 202(e) enacted in 1956.[12] The effect of the amendment was to restore a widow's benefits which had been terminated by her remarriage where the remarriage was ended within a year by reason of the husband's death. At the time of its enactment sufficient instances of annulment situations had existed to have commanded the attention of Congress, and to have moved it to take similar action to reinstate the benefits in the instance of annulment had it been so minded.

` The Court has carefully considered the various cases fervently pressed by the plaintiff in support of her position, such as Sparks v. United States, D.C.D. Vt., 153 F.Supp. 909; Pearsall v. Folsom, D.C.N.D.Cal., 138 F.Supp. 939 affirmed 9 Cir., 245 F.2d 562; Mays v. Folsom, D.C.D.Idaho, 143 F.Supp. 784. In each the determination of status was predicated upon state law or the lack of power under state law to compel support from the husband under the annulled marriage. And this is also true of Sparks v. United States where my learned colleague Judge Gibson held that federal law controlled. Yet, it is significant that in holding the wife was not remarried within the meaning of Section 202(e) (1) upon the annulment of her second marriage he stated: "[The marriage] being annulled, under Common Law she could secure no support * * * since [her husband] had no legal duty cast upon him * . * *." 153 F.Supp. 911. It is clear that the rationale in all the cases was. the lack of availability of economic support for the wife from the husband who had been a party to the annulled marriage.

Accordingly the defendant's motion for summary judgment is granted.

Settle order on notice.